## McCONNELL v. PAYNE, Agent.
### (No. 533–3729.)

(Commission of Appeals of Texas, Section A.
May 14, 1924.)

1. **Railroads** ⊜⇒5½, New, vol. 6A Key-No. Series—**Director General authorized to limit liability in intrastate transportation.**

Under Federal Control Act (U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919, §§ 3115¾a–3115¾p). Director General of Railroads had authority to fix rates affecting intrastate carriage of baggage by railroads and promulgate regulations limiting recovery, where baggage was lost, to $100, where no value was declared.

2. **Railroads** ⊜⇒5½, New, vol. 6A Key-No. Series—**Statute limiting carrier's right to limit common-law liability suspended during federal control.**

Rev. St. art. 708, providing that no common carrier should limit or restrict its liability as at common law, was suspended during operation of railroads under Federal Control Act (U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919, §§ 3115¾a–3115¾p).

3. **Carriers** ⊜⇒405(4)—**Party not declaring value of baggage in intrastate shipment limited to recovery of $100.**

In intrastate carriage of baggage during federal control and after tariff promulgated during such control became effective, where owner of bagage made no declaration as to value and paid no additional rate, his recovery therefor was limited to $100.

Error to Court of Civil Appeals of Sixth Supreme Judicial District.

Action by Pearl McConnell against John Barton Payne, Agent. Judgment for plaintiff was reformed and affirmed by Court of Civil Appeals (234 S. W. 942), and plaintiff brings error. Affirmed.

· F. J. McCord and Lacy & Bramlette, all of Longview, for plaintiff in error.

Young & Stinchcomb, of Longview, and Geo. Thompson and R. S. Shapard, both of Dallas, for defendant in error.

CHAPMAN, J.   Plaintiff, Pearl McConnell, recovered judgment in the district court against defendant, Jno. Barton Payne, Agent, for $1,360.50, for loss of baggage in an intrastate carriage by a railroad. The Court of Civil Appeals reduced the judgment to $100, for the reason that the railroad, at the time of carriage of the baggage, was under federal control, and the following tariff was in effect:

"Rule 10. (a) Subject to limitations shown in rule 9 [immaterial to the question made by the record], 150 pounds of baggage, not exceeding $100 in value, may be checked without additional charge for each adult passenger.

"Rule 11. (d) Unless a greater sum is declared by a passenger and charges paid for ex-cess value at time of delivery to carrier, the value of property belonging to, or checked for, a passenger shall be deemed and agreed to be not in excess of the amount specified in rule 10, and the carriers issuing and participating in this tariff will not accept claim for a greater sum in case of loss or damage.

"If passenger declares according to the form prescribed by checking carrier, a greater value than specified in the rule mentioned in the preceding paragraph, there will be an additional charge at the rate of 10 cents for each $100 or fraction thereof above such agreed value."

·The Court of Civil Appeals found that the Director General of Railroads had complied with all requirements in promulgating said tariff, and that the plaintiff had no actual notice of said tariff, and that plaintiff made no declaration as to the value of her baggage.

[1] The question now before this court is as to whether the President, under the Federal Control Act (U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919, §§ 3115¾a–3115¾p), had authority to fix rates affecting the intrastate carriage of baggage by railroads.

In the case of ·Boston & Maine Railroad Company v. Hooker, 233 U. S. 97, 34 Sup. Ct. 526, 58 L. Ed. 868, L. R. A. 1915B, 450, Ann. Cas. 1915D, 593, the question of excess value of baggage and notice to the passenger in an interstate carriage was considered at length, and the cases on the subject reviewed. The regulation limiting the value to $100 where no value was declared was upheld, and it was held that the notice which follows from the filed and published regulations as required by the statute and the order of the Interstate Commerce Commission was sufficient to charge the passenger with notice of the regulation, and that, if the passenger declares no valuation of his baggage, the rate fixed by the regulation and the corresponding liability automatically attach. In discussing these questions the court said:

"The effect of such filing is to permit the carrier by such regulations to obtain commensurate compensation for the responsibility assumed for the safety of the passenger's baggage, and to require the passenger, whose knowledge of the character and value of his baggage is peculiarly his own, to declare its value and pay for the excess amount. * * * But the effect of the regulations, filed as required, giving notice of rates based upon value when the baggage to ′be transported was of a higher value than $100, and the delivery and acceptance of the baggage without declaration of value or notice to the carrier of such higher value, charges the carrier with liability to the extent of $100 only."

In Northern Pacific Railroad Company v. North Dakota, 250 U. S. 135, 39 Sup. Ct. 502, 63 L. Ed. 900, the question before the court was stated at the outset of the case by

Chief Justice White, in the following language:

"In taking over the railroads from private ownership to its control and operation, was the resulting power of the United States to fix the rates to be charged for the transportation services to be by it rendered subordinated to the asserted authority of the several states to regulate the rates for all local or intrastate business, is the issue raised on this record."

And in discussing this question, the court used the following language:

"We are thus brought to the question whether the state authority controls the power of the United States as to intrastate rates. No elaboration could make clearer than do the act of Congress of 1916, the proclamation of the President exerting the powers given, and the act of 1918, dealing with the situation created by the exercise of such authority, that no divided but a complete possession and control were given the United States for all purposes as to the railroads in question. But if it be conceded that, despite the absolute clarity of the provisions concerning the control given the United States, and the all-embracing scope of that control, there is room for some doubt, the consideration of the general context completely dispels hesitancy. How can any other conclusion be reached if consideration be given the comprehensive provisions concerning the administration by the United States of the property which it was authorized to take, the financial obligations under which it came, and all the other duties and exactions which the act imposed, contemplating one control, one administration, one power for the accomplishment of the one purpose, the complete possession by governmental authority to replace for the period provided the private ownership theretofore existing? This being true, it must follow that there is no basis for the contention that the power to make rates and enforce them, which was plainly essential to the authority given, was not included in it. Conclusive as are these inferences, they are superfluous, since the portion of section 10, as previously reproduced in the margin, in express terms confers the complete and undivided power to fix rates. * * *

"(b) The elementary principle that, under the Constitution, the authority of the government of the United States is paramount when exerted as to subjects concerning which it has the power to control, is indisputable. This being true, it results that, although authority to regulate within a given sphere may exist in both the United States and in the states, when the former calls into play constitutional authority within such general sphere the necessary effect of doing so is that to the extent that any conflict arises the state power is limited, since in case of conflict that which is paramount necessarily controls that which is subordinate."

In the case of Dakota Central Telephone Co. et al. v. State of South Dakota, 250 U. S. 163, 39 Sup. Ct. 507, 63 L. Ed. 910, 4 A. L. R. 1623, the question before the court was whether, during federal control, the Postmaster General had the right to fix intrastate telephone rates, and the court held that he did have such authority.

In the case of Public Service Commission v. New York Central Railroad Company, 230 N. Y. 149, 129 N. E. 455, 14 A. L. R. 449, the Court of Appeals of New York held that the Director General of Railroads had the power during federal control to fix intrastate railroad passenger fares. In this case the railroad company was limited to a charge for passenger fares to 2 cents a mile, both by the charter of the railroad and by the laws of the state. The Director General of Railroads raised this rate to 3 cents per mile between intrastate points, and the court held, in the following language, that he had such power:

(1) "On December 28, 1917, under authority of an act of Congress, the President entered into 'possession, use, control and operation' of the New York Central Railroad and later fixed a rate of fare upon that road, for all passengers, at 3 cents a mile. This action was not justified by any of the ordinary rules of law, It can be sustained solely as the exercise of the war powers of the United States. And these powers are not limited by these ordinary rules. They are not bounded by any specific grant of authority. They are not unlike what in the states we call the police power, but the police power raised to the highest degree. They are such powers as are essential to preserve the very life of the nation itself. When requisite to this end the liberty of the citizen —the protection of private property—the peace time rights of the states must all yield to necessity."

The Supreme Court of North Carolina (Powell v. Hines, Director General of Railroads, 180 N. C. 665, 104 S. E. 533) and the Supreme Court of Appeals of Virginia (Hines, Director General of Railroads, v. Burnett, 130 Va. 297, 107 S. E. 657) each had under consideration in baggage cases the identical question that we have before us, and each of these courts held that during federal control of railroads, in intrastate carriage of baggage, the party who lost baggage could, under the terms of the tariff above set out, recover only $100 for loss of baggage unless the party had declared a higher valuation and paid the extra rate as set out in said tariff.

In Payne, Agent, v. West, 251 S. W. 565, the Court of Civil Appeals of the Third District of Texas had under consideration the precise question that we have in this case, and the court made the same holding as did the Supreme Courts of North Carolina and Virginia, above referred to.

[2, 3] Plaintiff in error insists that under the provisions of article 708 of the Revised Civil Statutes of Texas the federal government could not limit the amount of recovery of plaintiff. It has been held that this statute does not apply to interstate shipments because the federal government had the

right to fix the rates applicable to interstate shipments on railroads. Such being the law, then, when conditions arose whereby the right to fix intrastate rates was lodged in the federal government, it would naturally follow that this law would not affect such right. It appears to us that the authorities clearly hold that in an intrastate carriage of baggage, during the federal control of railroads, and after the tariff went into effect, where the owner of the baggage made no declaration as to value and did not pay the additional rate fixed by the tariff, where the baggage is lost as in this case, the party losing the baggage is limited to a recovery of $100.

We therefore recommend that the judgment of the Court of Civil Appeals be affirmed.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.